UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------X

```
                                        :
VITO V. COSTA and MARION P. COSTA,      :
                                        :
                        Plaintiffs,     :
                                        :
            v.                          :
                                        :
DEUTSCHE BANK NATIONAL TRUST            :
COMPANY AS TRUSTEE FOR GSR              :
MORTGAGE LOAN TRUST 2006-OAI,           :
MORTGAGE PASS-THROUGH                   :
CERTIFICATES, SERIES 2006-OA1, and      :
SPECIALIZED LOAN SERVICING LLC,         :
                                        :
                        Defendants.     :
                                        :
```

------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: March 30, 2017

15 Civ. 2674 (KPF)

OPINION AND ORDER

KATHERINE POLK FAILLA, District Judge:

Stripped of its technical jargon, this case is about whether a nearly decade-old defaulted mortgage loan remains enforceable. Plaintiffs Vito and Marion Costa argue that the applicable six-year statute of limitations has expired and that they are therefore entitled to the cancellation and discharge of their mortgage loan. Defendants, the loan trustee and the servicer, maintain that the limitations period has not expired because it had not started prior to this action or, if it had, it was tolled or renewed; thus, foreclosure is warranted. Even if their foreclosure claim is time-barred, however, Defendants still seek to recoup their expenses in maintaining the property over the past decade. The parties filed cross-motions for summary judgment pursuant to Federal Rule of Civil Procedure 56 following the close of discovery. For the reasons that follow, Plaintiffs' motion is granted and Defendants' motion is denied.

## BACKGROUND[1]

### A.   Factual Background[2]

### 1.   The Costas' Mortgage Loan

Plaintiffs own the property located at 60 Interlaken Avenue in New Rochelle, New York (the "Property").  (Pl. 56.1 ¶ 1).  On May 9, 2006, Vito took out a mortgage loan with IndyMac Bank F.S.B. ("IndyMac") as nominal lender in the amount of $544,000 (the "Loan").  (*Id.* at ¶ 17).  To accomplish this, Vito executed a note to IndyMac in that amount (the "Note"), and both Vito and

---

[1] The facts in this Opinion are drawn from the parties' submissions in connection with the cross-motions for summary judgment, including Plaintiffs' Local Rule 56.1 Statement ("Pl. 56.1" (Dkt. #37)); Defendants' opposition to this statement ("Def. 56.1 Opp." (Dkt. #44)); Defendants' own Local Rule 56.1 Statement ("Def. 56.1" (Dkt. #43)); Plaintiffs' combined opposition to this statement and their own supplemental statement ("Pl. 56.1 Opp." (Dkt. #50)); and Defendants' opposition to Plaintiffs' supplemental statement ("Def. 56.1 Supp. Opp." (Dkt. #54)).  In addition, the Court has drawn on various declarations and affirmations from attorneys and witnesses, along with the exhibits thereto (cited using the convention "[Name] [Decl. or Aff.]" (Dkt. #38, 39, 46-49, 52, 55)).  In many cases, the parties have marked the same documents as exhibits; in such instances, the Court will provide only one citation to the document.

Citations to a party's Local Rule 56.1 Statement incorporate by reference the documents cited therein.  Where facts stated in a party's Local Rule 56.1 Statement are supported by testimonial or documentary evidence, and denied with only a conclusory statement by the other party, the Court finds such facts to be true.  *See* Local Rule 56.1(c), (d).

For convenience, the Court will refer to Plaintiffs' brief in support of their motion for summary judgment as "Pl. Br." (Dkt. #41); Defendants' combined brief opposing Plaintiffs' motion and supporting Defendants' own cross-motion for summary judgment as "Def. Br." (Dkt. #45); Plaintiffs' combined brief replying in further support of their own motion and opposing Defendants' motion as "Pl. Reply" (Dkt. #51); and Defendants' combined brief sur-replying in opposition to Plaintiffs' motion and replying in support of their own motion as "Def. Reply" (Dkt. #53).  Further, the Court will refer to the First Amended Complaint as "FAC" (Dkt. #14), and Defendants' Answer and Counterclaims to the FAC as "Ans." (Dkt. #18).

The Court occasionally refers to the Costas collectively (e.g. "the Costas' Loan," "the Costas' Default"), but it recognizes that only Vito Costa is named in the note, while both Vito and Marion Costa are named in the mortgage.  As appropriate, the Court refers to the Plaintiffs by their first names throughout this Opinion.

[2] Unless otherwise indicated, none of the facts set forth in this section is genuinely in dispute.

Marion secured the Note by granting a corresponding mortgage on the Property

(the "Mortgage," and collectively, the "Loan Instruments") to Mortgage

Electronic Registration Systems, Inc. ("MERS") as nominee for IndyMac.  (*Id.* at

¶¶ 12, 17, 30; Steiner Decl., Ex. E (Note); *id.*, Ex. D (Mortgage)).[3]  The

adjustable-rate Note, which IndyMac endorsed in blank, has an initial yearly

interest rate of 2.85% and an interest-rate cap of 9.95%.  (Pl. 56.1 ¶¶ 18, 22).

---

[3]     The Mortgage appears to have been recorded in the Westchester County Clerk's Office
on November 5, 2007.  (Def. 56.1 ¶ 4; Steiner Decl., Ex. D (Mortgage)).  IndyMac acted
as servicer of the Loan pursuant to an August 1, 2006 Pooling and Servicing Agreement
(the "PSA").  (Pl. 56.1 ¶ 27).  The PSA is between GS Mortgage Securities Corporation, as
Depositor, Wells Fargo Bank, N.A., as Securities Administrator and Master Servicer,
and Deutsche Bank National Trust Company ("DB"), as Trustee and Custodian.  (Ward
Decl. ¶ 11; Steiner Decl., Ex. C).  An Amended and Restated Servicing Agreement
between Goldman Sachs Mortgage Company and IndyMac, dated November 1, 2005,
also governed IndyMac's servicing of the Loan.  (*See* Steiner Decl., Ex. G; Plaintiffs'
Request to Take Judicial Notice, Ex. AR, AT; *see also* Tr. of June 8, 2016 Discovery
Dispute Conf., Dkt. #61, at 11:4-12:8).  After IndyMac Bank F.S.B. failed in July 2011,
its successor as servicer was IndyMac Mortgage Services, a division of OneWest, until
June 2014, when servicing was transferred to Specialized Loan Servicing LLC ("SLS").
(*See* Steiner Decl., ¶ 12, Ex. K; Def. 56.1 ¶ 24; *see also* Def. Br. 5; Pl. Reply 1 n.1).  The
Court recognizes that IndyMac Bank F.S.B. and IndyMac Mortgage Services were two
different servicers for the Loan.  Because this Opinion's statute of limitations analysis is
not materially affected by which IndyMac entity was the valid servicer at a given time,
the Court refers to both entities as "IndyMac" for ease of reference.

Moreover, a series of assignments and corrective assignments of the Mortgage were
executed between March 2008 and June 2015 leading back to DB, with both parties
under the misimpression that DB was not in possession of the Note and Mortgage during
that entire period.  (*See* Ward Decl., ¶¶ 7-9; Pl. 56.1 ¶¶ 35-42; *see also* FAC ¶¶ 12-18;
Ans. ¶¶ 4-6; Def. Br. 15 n.4).  In fact, however, the parties learned during discovery in
this action that DB had maintained possession of the Note and Mortgage since May 18,
2006, just over a week after the Loan closing.  (*See, e.g.*, Ward Decl., ¶ 10).  The details of
this chain of assignments, and the reality of DB's long-term possession of the Note and
Mortgage, *may* have implications for whether a 2008 foreclosure action brought by
IndyMac was legally effective in accelerating the Loan and allowing the statute of
limitations to accrue.  Defendants contend that the foreclosure action was legally
ineffective in this regard.  (*See, e.g.*, Def. Br. 14 ("IndyMac Bank could not have
accelerated the mortgage debt on March 20, 2008, irrespective of the allegations
advanced in its foreclosure complaint … [because] IndyMac Bank was not the holder of
the Note and Mortgage at the time the 2008 Foreclosure was commenced.")).  Plaintiffs
meanwhile contend that the PSA and Servicing Agreement conferred the requisite
authority on IndyMac to render the foreclosure-action acceleration effective.  (*See, e.g.*,
Pl. Br. 9-11; Pl. Reply 4).  As will be demonstrated *infra*, however, the Court finds that
the Loan was accelerated by a different, earlier means, and therefore the Court does not
reach the issue of whether the foreclosure action accelerated the Loan.

Defendant Deutsche Bank National Trust Company ("DB") is a National Banking Association with its principal place of business in Los Angeles, California.  (Pl. 56.1 ¶ 2).  DB is the Trustee for GSR Mortgage Loan Trust 2006-OA1, Mortgage Pass-Through Certificates, Series 2006-0A1, which owns the Loan (the "Trust"); DB is being sued in its capacity as Trustee.  (*Id.*; Def. 56.1 ¶ 10).[4]  Defendant Specialized Loan Servicing LLC ("SLS") is a Delaware limited liability company and the current servicer of the Loan.  (Pl. 56.1 ¶ 5).

On May 18, 2006, just over a week after the Loan closing, DB took physical possession of the Note and Mortgage, and maintained possession of these instruments at a location in Santa Ana, California, until January 7, 2016.  (Pl. 56.1 ¶¶ 25-26; Def. 56.1 ¶¶ 5-6; Steiner Decl., Ex. A (Ward Dep.), at 46:8-47:6).  On that date, SLS caused DB to transfer the instruments to Defendants' counsel in this matter, with whom the instruments remain.  (Def. 56.1 ¶ 7; Haber Decl., ¶¶ 2-3).

### 2.    The Costas' Loan Default and the 2008 Foreclosure Action

Vito began making monthly payments on the Loan starting in July 2006. (Costa Decl., ¶ 11).  He made seventeen payments through November 2007, but was unable to make the December 2007 monthly payment or any thereafter. (*Id.* at ¶¶ 11, 13; Pl. 56.1 ¶ 43; Def. 56.1 ¶ 11).

On or about February 4, 2008, IndyMac sent Vito a notice notifying him that the Loan was in default (the "Notice of Default" or the "Notice").  (Pl. 56.1

---

[4]    DB was incorrectly pled as Trustee for "GSR Mortgage Trust Loan Trust 2006-OAI."  (Pl. 56.1 ¶ 2; Def. 56.1 Opp. ¶ 2).  The Clerk of Court is directed to modify the docket to conform to the caption of this Opinion.

¶ 44; Def. 56.1 ¶ 12; Steiner Decl., Ex. M (Notice of Default)).  The Notice is examined in greater detail *infra* but, broadly speaking, it informed Vito of the amount owed on the Loan and the consequences of not curing the default by March 7, 2008.  (Pl. 56.1 ¶ 45; Def. 56.1 ¶ 12; Steiner Decl., Ex. M (Notice of Default); Ward Decl. ¶ 15).  Those consequences included a potential foreclosure action and sale of the Property.  (Steiner Decl., Ex. M (Notice of Default)).

Vito failed to cure the defaulted Loan by the March 7, 2008 deadline. (Def. 56.1 ¶ 13).  Consequently, on March 20, 2008, IndyMac commenced a foreclosure action against the Costas in New York State Supreme Court, Westchester County (the "Westchester Court"), entitled *IndyMac Bank, F.S.B.* v. *Vito V. Costa, et al.*, Index No. 005909/2008 (the "2008 Foreclosure Action"). (Def. 56.1 ¶ 14; Pl. 56.1 ¶ 48).  On April 15, 2008, the Costas filed an answer and counterclaims in that action; they also filed a third-party complaint against the mortgage broker and affiliated individuals, all of whom had originally facilitated the Loan.  (Pl. 56.1 ¶ 52; Steiner Decl., Ex. P, Q).  The gist of both pleadings was that the Costas had been duped into taking out the Loan:  They thought they were receiving a *fixed*-rate loan at 2.85%, when in fact they were given an *adjustable*-rate loan with an initial rate of 2.85% and a capped rate of 9.95%.  (Pl. 56.1 ¶ 53; Costa Decl. ¶¶ 5-6, 8-9, 11, 15).  The third-party action was removed to federal court and eventually settled, but the 2008 Foreclosure Action remained active in the Westchester Court.  (Pl. 56.1 ¶¶ 54-57).

On July 11, 2008, the Office of Thrift Supervision closed IndyMac and appointed the Federal Deposit Insurance Corporation (the "FDIC") as its receiver.  (Pl. 56.1 ¶ 36).  The FDIC organized IndyMac as a federal savings association, IndyMac Federal Savings Bank F.S.B. ("IndyMac Federal"), and became its conservator.  (*Id.*).  IndyMac Federal never substituted for IndyMac in the 2008 Foreclosure Action after the latter's failure.  (Pl. 56.1 ¶ 58; Steiner Decl., Ex. V).  And there was no case activity in the 2008 Foreclosure Action between April 15, 2008, the date on which the Costas filed their answer and counterclaim, and roughly four years later, on May 3, 2012, when IndyMac filed a Request for Judicial Intervention (the "RJI").  (Pl. 56.1 ¶¶ 59-60; Steiner Decl., Ex. V, O).  Following the RJI, the 2008 Foreclosure Action was referred to the Westchester Court's "Foreclosure Settlement Part," and a May 7, 2012 "Foreclosure Conference Notice" was issued to Vito, notifying him that an initial settlement conference was scheduled for June 26, 2012.  (Pl. 56.1 ¶ 61; Steiner Decl., Ex. W, X).

### 3.   The Parties' Unsuccessful Settlement Efforts and Dismissal of the 2008 Foreclosure Action for Failure to Prosecute

In an effort to resolve the 2008 Foreclosure Action, the parties engaged in seven settlement conferences between June 26, 2012, and August 26, 2013. (Haber Decl., Ex. C; Steiner Decl., Ex. W).  As part of this process, the court referee set forth a schedule for the submission and consideration of a loan-modification application.  (Pl. 56.1 ¶ 70; Steiner Decl., Ex. AQ).  Between October 2012 and June 2013, Vito submitted five applications to IndyMac under the Home Affordable Modification Program ("HAMP"), a federal program

designed to assist financially struggling homeowners with their monthly loan payments. (Pl. 56.1 ¶¶ 68-79; Steiner Decl., Ex. Z (Oct. 2012); *id.*, Ex. AB (Feb. 2013); *id.*, Ex. AP (Apr. 2013); *id.*, Ex. AE (May 2013); *id.*, Ex. AG (June 2013)). Along with his February 2013 and April 2013 applications, Vito submitted identical hardship letters outlining the reasons for his request (the "Hardship Letters"). (Pl. 56.1 ¶ 80; Steiner Decl., Ex. AK). The contents of these HAMP applications, and IndyMac's responses, are detailed *infra.* Ultimately, however, IndyMac found none of Vito's HAMP applications to be complete and, therefore, never considered him for a loan modification. (Def. 56.1 Opp. ¶¶ 69-79).

Accordingly, on August 26, 2013, the Westchester Court issued a Notice to Resume Prosecution. (Pl. 56.1 ¶ 81). That notice told IndyMac that its prosecution of the 2008 Foreclosure Action "must be resumed"; that its note of issue "must be served" within 90 days of the receipt of the notice; and that its motion for summary judgment "must be made" within 120 days after the filing of the note of issue. (Steiner Decl., Ex. AL). The notice also cautioned that failure to comply with any of the aforementioned directives would require IndyMac to show a justifiable excuse for its failure at a January 29, 2014 conference. (*Id.*). The notice concluded with the following warning: "[IndyMac's] failure to appear and show justifiable excuse on said date shall result in the dismissal of the complaint, upon the court's own initiative, for want of prosecution of the above-referenced action pursuant to CPLR [§] 3216(a) and (e)." (*Id.*).

IndyMac never filed a note of issue.  (Pl. 56.1 ¶ 84).  Nor did it take any other steps to prosecute the 2008 Foreclosure Action.  (*Id.*).  Accordingly, on January 31, 2014, the Westchester Court dismissed the 2008 Foreclosure Action for failure to prosecute.  (*Id.*; Def. 56.1 ¶ 16; Steiner Decl., Ex. AM).[5]

### 4.    The Property's Carrying Costs

After the Plaintiffs' December 2007 default, the Loan's servicers began making payments toward the Property's taxes, assessments, water rates, escrow, insurance premiums, and related charges (the "Carrying Costs").  (Def. 56.1 ¶ 17; Ward Aff., ¶ 19).  When SLS began servicing the Loan in June 2014, it reimbursed the prior servicer for the entire balance of the escrow advances, $106,116.59.  (*See* Ward Aff., ¶ 20).  From June 2014 through the present, SLS has continued to make advances for the Property's Carrying Costs.  (*See id.* at ¶ 20, Ex. O).  Moreover, the entirety of the escrow advances made by the prior servicers and SLS has been reimbursed by DB, totaling about $149,042.93 as of the date of Defendants' Local Rule 56.1 Statement.  (*See id.* at ¶ 22; Haber Decl., ¶ 4, Ex. B).

## B.    Procedural Background

Plaintiffs filed this action in New York State Supreme Court, Westchester County, on February 23, 2015.  (Dkt. #1).  The matter was removed to this Court on April 6, 2015.  (*Id.*).  After about five months of discovery, the parties filed cross-motions for summary judgment.  Plaintiffs filed their motion and

---

[5]    The January 31, 2014 order was docketed on February 4, 2014.  (Steiner Decl., Ex. V, AM).

supporting materials on March 21, 2016.  (Dkt. #36-41).  Defendants filed their motion, a combined brief supporting their motion and opposing Plaintiffs', and supporting materials on April 18-19, 2016.  (Dkt. #42-48).  Plaintiffs filed a combined brief opposing Defendants' motion and replying in support of their own motion on May 5, 2016.  (Dkt. #51).  Defendants filed a combined brief replying in support of their own motion and sur-replying in opposition to Plaintiffs' on May 23, 2016 (Dkt. #53), concluding the briefing on the instant motions.

## DISCUSSION

### A.  Applicable Law

#### 1.  Motions for Summary Judgment Under Rule 56

Rule 56(a) instructs a court to "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).[6]  "When ruling on a summary judgment motion, the district court must construe the facts in the light most favorable to the non-moving party and must resolve all

---

[6]    The 2010 Amendments to the Federal Rules of Civil Procedure revised the summary judgment standard from a genuine "issue" of material fact to a genuine "dispute" of material fact.  *See* Fed. R. Civ. P. 56, advisory comm. notes (2010 Amendments) (noting that the amendment to "[s]ubdivision (a) ... chang[es] only one word — genuine 'issue' becomes genuine 'dispute.' 'Dispute' better reflects the focus of a summary-judgment determination.").  As of this past year, the Second Circuit continues to use both formulations.  *Compare, e.g., Smith* v. *Barnesandnoble.com, LLC*, 839 F.3d 163, 166 (2d Cir. 2016) ("The moving party bears the burden to demonstrate the absence of any genuine issues of material fact."), *with, e.g., Harris* v. *Miller*, 818 F.3d 49, 54 (2d Cir. 2016) ("[W]e conclude that there are genuine disputes of material fact[.]").  Indeed, the Circuit sometimes uses the terms interchangeably within the same decision.  *Compare, e.g., Cross Commerce Media, Inc.* v. *Collective, Inc.*, 841 F.3d 155, 162 (2d Cir. 2016) ("[T]here is a genuine dispute of material fact[.]"), *with, e.g., id.* at 168 ("We therefore think that [the nonmovant] has raised a genuine issue of material fact[.]").  This Court uses the post-amendment standard, but continues to be guided by pre-amendment Supreme Court and Second Circuit precedent.

ambiguities and draw all reasonable inferences against the movant." *Pace* v. *Air & Liquid Sys. Corp.*, 171 F. Supp. 3d 254, 262 (S.D.N.Y. 2016) (internal quotation marks omitted) (quoting *Dallas Aerospace, Inc.* v. *CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 2003)).  And where, as here, "'parties file cross-motions for summary judgment, ... each party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration.'" *Fireman's Fund Ins. Co.* v. *Great Am. Ins. Co. of N.Y.*, 822 F.3d 620, 631 n.12 (2d Cir. 2016) (alterations omitted) (quoting *Morales* v. *Quintel Entm't, Inc.*, 249 F.3d 115, 121 (2d Cir. 2001)).

"A motion for summary judgment may properly be granted ... only where there is no genuine issue of material fact to be tried, and the facts as to which there is no such issue warrant the entry of judgment for the moving party as a matter of law." *Rogoz* v. *City of Hartford*, 796 F.3d 236, 245 (2d Cir. 2015) (quoting *Kaytor* v. *Elec. Boat Corp.,* 609 F.3d 537, 545 (2d Cir. 2010)).  In determining whether summary judgment is merited, "[t]he role of a court ... is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried, while resolving ambiguities and drawing reasonable inferences against the moving party." *NEM Re Receivables, LLC* v. *Fortress Re, Inc.*, 173 F. Supp. 3d 1, 5 (S.D.N.Y.) (internal quotation mark and citation omitted), *reconsideration denied,* 187 F. Supp. 3d 390 (S.D.N.Y. 2016).

A party moving for summary judgment "bears the initial burden of demonstrating 'the absence of a genuine issue of material fact.'" *ICC Chem. Corp.* v. *Nordic Tankers Trading A/S*, 186 F. Supp. 3d 296, 301 (S.D.N.Y. 2016)

(quoting *Celotex Corp.* v. *Catrett*, 477 U.S. 317, 323 (1986)).  "[A] fact is material if it 'might affect the outcome of the suit under the governing law.'"  *Royal Crown Day Care LLC* v. *Dep't of Health & Mental Hygiene of City of N.Y.*, 746 F.3d 538, 544 (2d Cir. 2014) (quoting *Anderson* v. *Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)).  And "[a] dispute is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"  *Fireman's Fund Ins. Co.*, 822 F.3d at 631 n.12 (quoting *Anderson*, 477 U.S. at 248).

If the movant satisfies its initial burden, then "the adverse party must set forth specific facts showing that there is a genuine issue for trial."  *Anderson*, 477 U.S. at 250 (internal quotation marks and citation omitted).  To make this showing, a summary-judgment "opponent must do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co.* v. *Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  Rather, that opponent must adduce "evidence on which the jury could reasonably find for" him.  *Anderson*, 477 U.S. at 252.

### 2.    Article 15 of the Real Property Actions and Proceedings Law

In New York, the equitable action to quiet title has been largely replaced by proceedings under Article 15 of the Real Property Actions and Proceedings Law (the "RPAPL").  *See Barberan* v. *Nationpoint*, 706 F. Supp. 2d 408, 416-17 (S.D.N.Y. 2010) (citing 2-24 WARREN'S WEED NEW YORK REAL PROPERTY § 24.01); *see also W. 14th St. Commercial Corp.* v. *5 W. 14th Owners Corp.*, 815 F.2d 188, 196 (2d Cir. 1987) ("New York has codified the common law action to quiet title and statutorily redefined the necessary elements for a well-pleaded remaining

cloud on title complaint."). Article 15 does not, however, "limit any other remedy in law or equity," N.Y. R.P.A.P.L. § 1551; thus, a plaintiff "may choose to seek an equitable common law action to quiet title despite the existence of the RPAPL statute, or [he] may bring both claims." *Barberan*, 706 F. Supp. 2d at 417. But "[w]hether a quiet title action is commenced in equity or under RPAPL Article 15, the result is almost the same — although RPAPL Article 15 is a statutory action, 'it has been described as a hybrid one in which the relief awarded is in large measure equitable in nature.'" *Id.* (quoting *Dowd* v. *Ahr*, 563 N.Y.S.2d 917, 919 (3d Dep't 1990), *rev'd on other grounds*, 78 N.Y.2d 469 (1991)).

As relevant here, RPAPL Article 15 provides:

> Where the period allowed by the applicable statute of limitation for the commencement of an action to foreclose a mortgage, or to enforce a vendor's lien, has expired, any person having an estate or interest in the real property subject to such encumbrance may maintain an action against any other person or persons, known or unknown … to secure the cancellation and discharge of record of such encumbrance, and to adjudge the estate or interest of the plaintiff in such real property to be free therefrom. … In any action brought under this section it shall be immaterial whether the debt upon which the mortgage or lien was based has, or has not, been paid; and also whether the mortgage in question was, or was not, given to secure a part of the purchase price.

N.Y. R.P.A.P.L. § 1501(4). A successful Article 15 claim must set forth facts showing: (i) the nature of the plaintiff's interest in the real property and the source of this interest; (ii) that the defendant claims an interest in the property adverse to that of the plaintiff, and the particular nature of the interest;

(iii) whether any defendant is known or unknown, or incompetent; and

(iv) whether all interested parties are named.  *See id.* § 1515; *Guccione* v. *Estate of Guccione*, 923 N.Y.S.2d 591, 593 (2d Dep't 2011); *see also Knox* v. *Countrywide Bank*, 4 F. Supp. 3d 499, 513 (E.D.N.Y. 2014) (recognizing the "absence of a requirement that a plaintiff asserting a statutory quiet title claim plead 'invalidity'" of the defendant's mortgage interest).

A judgment issued pursuant to RPAPL Article 15 must "declare the validity of any claim ... established by any party," and may direct that an instrument purporting to create an interest deemed invalid be cancelled or reformed.  *Barberan*, 706 F. Supp. 2d at 417 (citing § 1521(1)); *see also TEG N.Y. LLC* v. *Ardenwood Estates, Inc.*, No. 03 Civ. 1721 (DGT), 2004 WL 626802, at *4 (E.D.N.Y. Mar. 30, 2004) (noting that in an RPAPL Article 15 action to compel the determination of a claim to real property, a court may determine the ownership interests in the property or reform a deed (citing § 1521(1))).  The judgment must "also declare that any party whose claim to an estate or interest in the property has been judged invalid, and every person claiming under him ... be forever barred from asserting such claim."  *Barberan*, 706 F. Supp. 2d at 417 (internal quotation marks omitted) (quoting § 1521(1)); *see also O'Brien* v. *Town of Huntington*, 884 N.Y.S.2d 446, 451 (2d Dep't 2009).

### 3.    Mortgage-Foreclosure Actions

Under New York law, "three elements must be established in order to sustain a foreclosure claim: [i] the proof of the existence of an obligation secured by a mortgage; [ii] a default on that obligation by the debtor; and

13

[iii] notice to the debtor of that default." *United States* v. *Paugh*, 332 F. Supp. 2d 679, 680 (S.D.N.Y. 2004); *see also R.B. Ventures, Ltd.* v. *Shane*, 112 F.3d 54, 59 n.2 (2d Cir. 1997); *United States* v. *Freidus*, 769 F. Supp. 1266, 1277 (S.D.N.Y. 1991).  "[C]ourts in this Circuit have found that summary judgment in a mortgage foreclosure action is appropriate where the Note and the Mortgage are produced to the Court along with proof that the [m]ortgagor has failed to make payments due under the Note." *Gustavia Home, LLC* v. *Rutty*, No. 16 Civ. 2823 (BMC), 2017 WL 354206, at *2 (E.D.N.Y. Jan. 24, 2017) (internal quotation marks and citation omitted).  "Once the [mortgagee] has made an affirmative showing of the [mortgagor's] default, the [mortgagor] must make 'an affirmative showing' that a defense to the action exists." *Id.*; *see also Paugh*, 332 F. Supp. 2d at 680 (same).

### B. Plaintiffs' Summary-Judgment Motion Is Granted in Its Entirety and Defendants' Summary-Judgment Motion Is Denied in Its Entirety

Plaintiffs move for summary judgment in favor of their RPAPL Article 15 action seeking the cancellation and discharge of record of the Mortgage, a declaration adjudging the Property to be free from an encumbrance relating to the Mortgage, and a declaration discharging Plaintiffs' obligations under the Note (*see* FAC ¶¶ 1, 22-29, 35-39; Pl. Br. 1, 28); and against Defendants' counterclaims and affirmative defenses (Pl. Br. 19-27).  Defendants move for summary judgment in favor of their foreclosure and unjust-enrichment

counterclaims and against Plaintiffs' claims and affirmative defenses.  (*See* Ans. ¶¶ 18-26; Def. Br. 17-39).[7]

These motions turn principally on a single inquiry: whether the statute of limitations to foreclose the Mortgage and enforce the Note has expired.  *See* N.Y. R.P.A.P.L. § 1501(4).  If it has expired, then the ancillary question is whether Defendants have established a claim of unjust enrichment.  Plaintiffs have the better of the arguments on both fronts and, accordingly, their motion is granted in its entirety and Defendants' denied in its entirety.

### 1.   Plaintiffs' Motion Is Granted and Defendants' Motion Is Denied on the Mortgage Loan-Related Claims and Counterclaims

#### a.   The Statute of Limitations on Defendants' Foreclosure Action Accrued on March 8, 2008

The statute of limitations inquiry begins with a deceptively simple question:  When did the statute of limitations accrue?  The short answer is: upon expiration of the period to cure the defaulted Loan.

#### i.   Applicable Law

It is undisputed that the New York statute of limitations governs the inquiry.  (Pl. Br. 11-15; Def. Br. 8).[8]  The New York Court of Appeals has

---

[7]   Defendants had asserted an equitable-mortgage counterclaim in their Answer (Ans. ¶¶ 27-30), but advance no argument in their summary-judgment briefs, even in the face of Plaintiffs' arguments for the dismissal of that counterclaim.  (*See generally* Def. Br., Def. Reply; *see also* Pl. Br. 28, Pl. Reply 23).  Accordingly, the claim is deemed abandoned and is dismissed.

[8]   Early on, the parties contested whether the Financial Institutions Reform, Recovery, and Enforcement Act ("FIRREA") governs the present statute-of-limitations inquiry.  Plaintiffs argue in Section II of their brief why it does not.  However, "Defendants [have] abandoned that argument ... [and] do not contest ... that the statute of limitations period set forth in FIRREA is inapplicable to the ... Loan, and agree that the applicable governing statute is New York CPLR § 213(4)."  (Def. Br. 8 n.1).

observed that the state's "statutes of limitation serve the same objectives of finality, certainty and predictability that New York's contract law endorses. Statutes of limitation not only save litigants from defending stale claims, but also express a societal interest or public policy of giving repose to human affairs." *ACE Sec. Corp.* v. *DB Structured Prod., Inc.*, 25 N.Y.3d 581, 593 (2015) (internal quotation marks and alterations omitted) (quoting *John J. Kassner & Co.* v. *City of N.Y.*, 46 N.Y.2d 544, 550 (1979)).

The statute of limitations for a mortgage-foreclosure action is six years under New York law.  *See* N.Y. C.P.L.R. § 213 ("[A]n action upon a bond or note, the payment of which is secured by a mortgage upon real property, or upon a bond or note and mortgage so secured, or upon a mortgage of real property, or any interest therein" shall "be commenced within six years."). Typically, the statute "begins to run from the due date for each unpaid installment." *Plaia* v. *Safonte*, 847 N.Y.S.2d 101, 102 (2d Dep't 2007).  "[E]ven if a mortgage is payable in installments," however, "once a mortgage debt is accelerated, the entire amount is due and the [s]tatute of [l]imitations begins to run on the entire debt." *EMC Mortg. Corp.* v. *Patella*, 720 N.Y.S.2d 161, 162 (2d Dep't 2001) (internal citations omitted); *id.* ("[O]nce a mortgage debt is accelerated, 'the borrowers' right and obligation to make monthly installments cease[s] and all sums [become] immediately due and payable', and the six-year [s]tatute of [l]imitations begins to run on the entire mortgage debt." (quoting *Federal Natl. Mortg. Ass'n* v. *Mebane*, 618 N.Y.S.2d 88, 90 (2d Dep't 1994))).

The Loan Instruments here offer the lender the *option* to accelerate the Loan if the borrower defaults.  The Mortgage provides that in the event of a default the "Lender may require that [the Borrower] pay immediately the entire amount then remaining unpaid under the Note … [and the] Lender may do [so] without making any further demand for payment." (Steiner Decl., Ex. D (Mortgage § 22), at 16).  Likewise, the Note indicates that "the Note Holder may require [the borrower] to pay immediately the full amount of principal that has not been paid." (*Id.*, Ex. E (Note § 7(C)), at 4; *see also* Def. Br. 11-12 ("[U]nder the terms of the … Loan, acceleration of the debt does not occur automatically upon default, but rather remains at the option of the holder.")).

Where, as here, the Mortgage and Note make loan acceleration an option, "some affirmative action must be taken evidencing the holder's election to take advantage of the accelerating provision, and until such action has been taken the provision has no operation." *Wells Fargo Bank, N.A.* v. *Burke*, 943 N.Y.S.2d 540, 542 (2d Dep't 2012).  This affirmative act of acceleration may be in the form of a demand or through the commencement of a foreclosure action.  *See Lavin* v. *Elmakiss*, 754 N.Y.S.2d 741, 743 (3d Dep't 2003) ("[O]nce the debt has been accelerated by a demand or commencement of an action, the entire sum becomes due and the statute of limitations begins to run on the entire mortgage."); *see also United States* v. *Alessi*, 599 F.2d 513, 515 n.4 (2d Cir. 1979) ("Such acceleration must consist of either notice of election to the [m]ortgagor or of some unequivocal overt act (such as initiating a foreclosure

suit) manifesting an election in such a way as to entitle the mortgagor, if he desires, to discharge the principal of the mortgage.").

Plaintiffs contend that either of two acts accelerated the Loan: the Notice of Default or, alternatively, the 2008 Foreclosure Action. Defendants maintain that neither effected an acceleration of the Loan and that, indeed, the Loan was not accelerated until "the filing of the counterclaim in this matter." (Def. Br. 17).

### ii.      IndyMac's Notice of Default Accelerated the Loan

"As with other contractual options," an acceleration-option holder "may be required to exercise [the] option ... in accordance with the terms of the note and mortgage." *Burke*, 943 N.Y.S.2d at 542; *id.* ("[T]he borrower must be provided with notice of the holder's decision to exercise the option to accelerate the maturity of a loan[.]"). The Loan Instruments here establish such terms. The Mortgage provides that the lender can accelerate the Loan "only if" (i) the Loan is in default, (ii) a conforming default notice is issued that provides at least a 30-day period to cure the default, and (iii) the borrower does not correct the default "by the date stated in th[e] notice." (Steiner Decl., Ex. D (Mortgage § 22), at 16). Similarly, the Note provides for "a written notice telling [the borrower] that if [he or she does] not pay the overdue amount by a certain date" that is "at least 30 days after" the notice is sent, the holder may accelerate the Loan. (Steiner Decl., Ex. E (Note § 7(C)), at 4).

In addition to complying with the loan instruments, a notice or demand to exercise the acceleration option "must be 'clear and unequivocal.'" *McIntosh*

18

v. *Fed. Nat'l Mortg. Ass'n*, No. 15 Civ. 8073 (VB), 2016 WL 4083434, at *5

(S.D.N.Y. July 25, 2016) (quoting *Burke*, 943 N.Y.S.2d at 542); *see also Sarva* v.

*Chakravorty*, 826 N.Y.S.2d 74, 75 (2d Dep't 2006) (same).

Here, IndyMac's February 4, 2008 Notice of Default provided in relevant

part:

> 1. THE AMOUNT OF THE DEBT:  Remaining principal balance as of 12-01-07 the default date, is $569,781.78 plus unpaid accrued interest, escrow/impound shortages or credits, late charges, legal fees/costs, and miscellaneous charges for a total of $ 7,299.75 to be reinstated within 30 days of this demand letter.
>
> 2. NAME OF THE CREDITOR TO WHOM THE DEBT IS OWED:  Indymac Bank
>
> 3. CONSEQUENCES OF FAILURE TO CURE THE DEFAULT:  Your failure to cure the default on or before March 07, 2008, will result in the acceleration of the sums secured by the above mortgage and sale of the mortgaged premises.

(Steiner Decl., Ex. M (Notice of Default), at 2).  The question is whether this

Notice constitutes a "clear and unequivocal" expression of IndyMac's

acceleration of the Loan.

Plaintiffs argue that it does and, therefore, that the Loan accelerated on

the date of the Notice, February 4, 2008.  (*See* Pl. Br. 8 ("[IndyMac] accelerated

the Loan by giving the notice of default on February 4, 2008.  Once that

happened, the entire amount of the Loan was due and payable.")).  Plaintiffs

subtly revise this position in their Reply Brief, arguing essentially that

acceleration occurred upon the expiration of the curing period on March 7,

2008.  (*See* Pl. Reply 7 ("The Notice of Default provided clear and unequivocal

notice of the lender's decision to accelerate *immediately after* the borrower's failure to pay on the specified date.")).  Defendants disagree; they maintain that the Notice merely "discusse[d] acceleration as a possible future event and in no way state[d] that all sums owed were immediately due and payable." (Def. Br. 11).[9]  In support of their position, Defendants rely principally on two New York State Appellate Division cases:  *Pidwell* v. *Duval*, 815 N.Y.S.2d 754 (3d Dep't 2006), and *Goldman Sachs Mortgage Co.* v. *Mares*, 23 N.Y.S.3d 444 (3d Dep't 2016).  The Court considers each of these decisions in turn.

In *Pidwell*, the default letter announced that failure to make an outstanding payment "would result in the entire balance of [the] Note and Mortgage being *called* all due and payable."  815 N.Y.S.2d at 756 (emphasis added) (internal quotation marks omitted).  This letter did not accelerate the loan, the Third Department reasoned, because it discussed "a possible future event" that "did not constitute an exercise of the … mortgage's optional acceleration clause."  *Id.* at 756-57.  The Third Department found the notice of default in *Mares* lacking for similar reasons.  There, the letter stated that failure to cure the default within 30 days "*may* result in acceleration of the sums secured by the mortgage."  *Mares*, 23 N.Y.S.3d at 445 (emphasis in original).  Relying on *Pidwell*, the *Mares* court held that

> [w]hile the letter does demand payment for all past due amounts, it falls far short of providing clear and unequivocal notice to defendants that the entire mortgage debt was being accelerated.  Indeed, with

---

9       Unlike in the foreclosure-acceleration debate referenced *supra* in note 3, Defendants do not argue that *IndyMac*'s issuance of the Notice of Default somehow rendered the *Notice* ineffective for purposes of acceleration.

> respect to acceleration, it is nothing more than a "letter
> discussing a possible future event," which "does not
> constitute an exercise of the … mortgage's optional
> acceleration clause."

*Id.* (internal citations and alterations omitted) (quoting *Pidwell*, 815 N.Y.S.2d at 756-57).

The Court does not quarrel with the reasoning or holding of these decisions; it simply finds them distinguishable. Here, the Notice of Default was a "clear and unequivocal" acceleration of the Loan upon expiration of the curing period because, unlike the *Pidwell* and *Mares* letters, the Notice did not discuss the mere possibility of a future event, nor did it couch acceleration in tentative terms. *See Pidwell*, 815 N.Y.S.2d at 756; *see Mares*, 23 N.Y.S.3d at 445. Rather, IndyMac's Notice itself lit the acceleration fuse: It announced that failure to cure by March 7, 2008, "*will* result in the acceleration of the sums secured by the above mortgage and sale of the mortgaged premises." (Steiner Decl., Ex. M (Notice of Default), at 2 (emphasis added)). This is a "clear and unequivocal" declaration that unless the default is cured, acceleration occurs on March 8, 2008; no further action by any party is needed.

New York courts faced with similar notice letters have reached the same conclusion. For example, in *United States Bank National Association* v. *Murillo*, the New York County Supreme Court found that a notice of default announcing that "it would become necessary to accelerate the Mortgage Note unless payments on the loan could be brought current [within 30 days]," coupled with the borrowers' failure to do so, meant "the mortgage debt was accelerated" and "the cause of action began to accrue" upon the expiration of the 30-day cure

21

period.  18 N.Y.S.3d 581 (Table), 2015 WL 4643739, at *3 (Sup. Ct. N.Y. Cty. 2015).  Decades earlier, the Third Department in *Colonie Block & Supply Co.* v. *D. H. Overmyer Co.* had likewise held that a "letter … advising [borrowers] that the option to accelerate would be exercised unless the delinquency was cured within 60 days" constituted a "clear and unequivocal" election to accelerate the debt such that it was deemed accelerated 60 days after the notice date.  315 N.Y.S.2d 713, 714-15 (3d Dep't 1970).

Defendants admit that *Colonie* "can be read as finding that a notice providing 60 days to cure and advising of the election to accelerate thereafter, constituted acceleration by itself."  (Def. Reply 4-5 n.5).  But they criticize *Colonie* on two related grounds:  (i) the decision is stale, predating cases such as *Pidwell* by over thirty years; and (ii) the decision has been effectively abrogated because the Third Department's 2016 decision in *Mares* highlighted it as an example of an ineffective notice that relied on a "possible future event" and did not accelerate the loan.  (*Id.*).

Defendants' criticism of *Colonie* is misplaced.  In short, they misread the import of *Mares*'s citation:  They take *Mares* to be critiquing *Colonie* when *Mares* is in fact commending it.  *Mares* had held that the letter there "f[ell] far short of providing clear and unequivocal notice to defendants that the entire mortgage debt was being accelerated."  *Mares*, 23 N.Y.S.3d at 445.  In support of this holding, the Third Department cited three decisions, directing the reader to compare the Fourth Department's decision in *Chase Mortgage Co.* v. *Fowler*,

22

721 N.Y.S.2d 184 (4th Dep't 2001), with the Third Department's own decisions in *Lavin* and *Colonie*.  *See Mares*, 23 N.Y.S.3d at 445.

In *Fowler*, the Fourth Department reversed the lower court's grant of foreclosure, holding that the lender "had not validly exercised its right to accelerate the debt because the notice of default did not clearly and unequivocally" advise the borrower that all sums were due.  *See Fowler*, 721 N.Y.S.2d at 184.  *Lavin*, by contrast, involved an April 25, 1991 notice of default that advised the borrower that the lender was accelerating the debt. *See Lavin*, 754 N.Y.S.2d at 742-43.  The Third Department recognized that the lender had "elected to accelerate the debt on April 25, 1991 and, accordingly, [the borrower's] counterclaim for foreclosure accrued on that date."  *Id.*  And, as earlier noted, *Colonie* likewise involved a default letter that qualified as a "clear and unequivocal" election to accelerate the debt, notwithstanding the 60-day cure period.  *See Colonie* 315 N.Y.S.2d at 714-15.

To recap, *Mares* compares *Fowler* — where the letter fell "far short of providing clear and unequivocal notice" of acceleration — with *Lavin* and *Colonie* — where the letters provided such "clear and unequivocal notice." *Mares*, 23 N.Y.S.3d at 445.  Properly understood, then, not only does the Third Department's 2016 *Mares* decision cite favorably to *Colonie*, assuaging Defendants' staleness concerns, but the decision affirmatively highlights *Colonie* as an example of what a valid, "clear and unequivocal" notice of acceleration looks like.  And there is no dispute over what *Colonie* stands for: that "a notice providing 60 days to cure and advising of the election to

accelerate thereafter, constituted acceleration by itself," to use Defendants' own words.  (Def. Reply 4-5 n.5).

The Court's instant holding is also supported by a July 2016 decision from the New York County Supreme Court.  In *Deutsche Bank National Trust Co.* v. *Unknown Heirs of Estate of Souto*, the court held that a default notice, nearly identical to the Notice here, effected the acceleration of the mortgage loan.  *See* 41 N.Y.S.3d 718 (Table), 2016 WL 3909071, at *3-4 (Sup. Ct. N.Y. Cty. 2016).  Specifically, the notice there provided that if the lender did not "cure the default within 30 days of the date of this notice, [the lender] will accelerate the Loan balance and proceed with foreclosure."  *Id.* at *2.  Deutsche Bank National Trust Company, the plaintiff there, made many of the same arguments that it makes here, which the *Souto* court summed up as follows:

> [P]laintiff now argues, in essence, that the letter was merely a warning, and that plaintiff had to do something else to actually accelerate the debt even if no payment was received by the deadline[;] … that the letter merely warns of a possible future event rather than set in motion the countdown to the acceleration[.]

*Id.* at *3.  The court delivered a resounding rejection of this argument:

> This is not a wishy-washy notice.  The Court finds that the phrase "will accelerate the Loan balance" means that plaintiff will accelerate the loan balance.  It means that unless plaintiff gets the money within thirty days, the note comes due and foreclosure will be the next step.  There is no indication that plaintiff is only kidding about the thirty day deadline, and that as long as the payment is received before the foreclosure action is commenced, the default will be cured.  There is no indication that there will be any other notices between the letter in the borrower's hands and the commencement of the foreclosure case.  The thirty days is the last chance to cure.

24

*Id.* at \*2.  *Souto* distinguished the tentatively phrased notices in *Pidwell* and *Mares* on the same basis earlier discussed, holding that "[t]hose cases would be controlling if the letter warned that plaintiff 'may accelerate' but the instant notice said 'will accelerate.'"  *Id.* at \*3.  *Souto* instead found its notice akin to those in *Colonie* and *Murillo*, where acceleration occurred upon expiration of the curing period.  *Id.*

Here, too, the Notice of Default expressed a "clear and unequivocal statement" of acceleration:  "[F]ailure to cure the default on or before March 07, 2008, *will result in the acceleration* of the sums secured by the above mortgage and sale of the mortgaged premises."  (Steiner Decl., Ex. M (Notice of Default), at 2 (emphasis added)).  When payment was not made "on or before" March 7, 2008, the Loan accelerated on the following day, March 8, 2008.  (*Id.*).  Once the Loan accelerated on this date, "all sums [became] immediately due and payable, and the six-year [s]tatute of [l]imitations beg[an] to run on the entire mortgage debt."  *Patella*, 720 N.Y.S.2d at 162.  Consequently, unless Defendants can demonstrate that the statute was renewed or tolled, Defendants' foreclosure action became time-barred on March 8, 2014.[10]

### b.    The Statute of Limitations Was Not Tolled

Defendants argue that even if the statute of limitations on their foreclosure claim accrued sometime in 2008, the statute has been sufficiently tolled under CPLR § 204 to permit their claim to proceed.  Section 204 provides

---

[10]    Because the Court holds that the Notice of Default effected the acceleration of the Loan, the Court need not reach the question whether the 2008 Foreclosure Action did so instead.  (*See* Def. Br. 13-16; Pl. Reply 8-11).

in relevant part:  "Where the commencement of an action has been stayed by a court or by statutory prohibition, the duration of the stay is not a part of the time within which the action must be commenced."  N.Y. C.P.L.R. 204(a). Courts have tolled foreclosure actions under § 204, for example, during a federal bankruptcy proceeding.  *See, e.g., Mercury Capital Corp.* v. *Shepherds Beach, Inc.,* 723 N.Y.S.2d 48, 48 (2d Dep't 2001).

Here, Defendants purport to identify several "statutory prohibitions" under § 204 that tolled the § 213 limitations period on their foreclosure counterclaim.  As set forth in the remainder of this section, the Court declines to adopt any of these novel tolling arguments, particularly given the paucity of state-law authorities presented.  *See City of New Rochelle* v. *Town of Mamaroneck*, 111 F. Supp. 2d 353, 370 (S.D.N.Y. 2000) ("The New York State law claims in the case are exemplars of the type of novel and complex state law issues which federal courts have no business deciding, especially on a matter of first impression."); *see also Regatos* v. *N. Fork Bank*, 396 F.3d 493, 498 (2d Cir. 2005) (recognizing that the Second Circuit has "regularly deferred to the views of New York's highest court in areas of first impression in New York law. Principles of federalism and comity require it; a vibrant and effective certification process ensures it").

### i.  The 2008 Foreclosure Action Did Not Toll the Statute of Limitations Period

Defendants rely first upon § 1301 of the RPAPL.  They claim that their foreclosure period was tolled "during the entire pendency of [the 2008] [F]oreclosure [A]ction" because § 1301 "prevents a mortgagee from commencing

simultaneous actions to collect upon the mortgage debt." (Def. Br. 18).
Defendants argue that this result comports with the purpose of a statute of
limitations:  "[The] reasserted claims for foreclosure are neither stale nor
brought by a party who could have instituted the action more expeditiously,"
there are no concerns about lost evidence or faded witness memories, and
"there is no prejudice suffered by Plaintiffs if [DB] is allowed to recommence
foreclosure." (*Id.* at 19-20).

> RPAPL § 1301, entitled "Separate action for mortgage debt," provides:
>
> > 1. Where final judgment for the plaintiff has been rendered in an action to recover any part of the mortgage debt, an action shall not be commenced or maintained to foreclose the mortgage, unless [certain conditions apply].
> >
> > 2. The complaint shall state whether any other action has been brought to recover any part of the mortgage debt, and, if so, whether any part has been collected.
> >
> > 3. While the action is pending or after final judgment for the plaintiff therein, no other action shall be commenced or maintained to recover any part of the mortgage debt, without leave of the court in which the former action was brought.

N.Y. R.P.A.P.L § 1301.  A review of § 1301's design and effect, and the absence
of supportive New York case law, indicate that the statute does not qualify as a
"statutory prohibition" that tolled Defendants' limitations period.

It is well-settled that "[§] 1301 requires the holder of a note and mortgage
to make an election of remedies — either to foreclose on the mortgage or to
recover on the note.  [The law] prevents a mortgagee of real property from
seeking to enforce rights upon default by pursuing a legal remedy and an

equitable remedy at the same time." *U.S. W. Fin. Servs., Inc.* v. *Marine Midland Realty Credit Corp.*, 810 F. Supp. 1393, 1402 (S.D.N.Y. 1993) (internal quotation marks omitted) (quoting *First Fidelity Bank, N.A.* v. *Best Petroleum, Inc.*, 757 F. Supp. 293, 296 (S.D.N.Y. 1991)); *see also Wells Fargo Bank, N.A.* v. *Goans*, 24 N.Y.S.3d 386, 387 (2d Dep't 2016) ("Where a creditor holds both a debt instrument and a mortgage which is given to secure the debt, the creditor may elect either to sue at law to recover on the debt, or to sue in equity to foreclose on the mortgage."); *Westnau Land Corp.* v. *U.S. Small Bus. Admin.*, 1 F.3d 112, 115 (2d Cir. 1993) (recognizing that under the RPAPL "a creditor is required to elect between the remedies of an action for money damages on a debt or an equitable action to foreclose a mortgage that secures the debt").

To the extent that the 2008 Foreclosure Action represents DB's election of its preferred remedy, that election was to sue in equity in order to foreclose on the Mortgage. Thus, § 1301 did not "statutorily prohibit" DB from bringing a foreclosure action; it simply forced DB (or, more specifically, its servicer) to make a choice between foreclosure on the mortgage or recovery on the note. Foreclosure was chosen then and it is chosen again now.

To find that by virtue of its 2008 foreclosure election, DB's time to pursue the *very same elected remedy* was automatically tolled would produce absurd results and undermine the purpose of a statute-of-limitations scheme.[11]  *See ACE Sec. Corp.*, 25 N.Y.3d at 593 ("[S]tatutes of limitation serve

---

[11]    Such a reading may also be in tension with CPLR § 205. That section provides:

> If an action is timely commenced and is terminated in any other
> manner than[, *inter alia*,] a dismissal of the complaint for neglect

the same objectives of finality, certainty and predictability … [and] not only save litigants from defending stale claims, but also express a societal interest or public policy of giving repose to human affairs." (internal citations and alterations omitted)).  Put differently, if the filing of an action to foreclose a mortgage automatically tolled the time to foreclose on that same mortgage, a string of neglected foreclosure actions on the same mortgage would be sanctioned and § 213's six-year statute of limitations eviscerated.  *Cf. Mebane*, 618 N.Y.S.2d at 89 ("The prior foreclosure action was … dismissed *sua sponte* by the court.  It cannot be said that a dismissal by the court constituted an affirmative act by the lender to revoke its election to accelerate."); *In re Palermo*, 739 F.3d 99, 105 (2d Cir. 2014) ("[A] suit dismissed without prejudice … is treated for statute of limitations purposes as if it had never been filed[.]").  Defendants identify no persuasive authority that recognizes so drastic a result flowing from RPAPL § 1301.[12]  This basis for tolling is thus rejected.

---

to prosecute the action …, the plaintiff … may commence a new action upon the same transaction or occurrence or series of transactions or occurrences within six months after the termination provided that the new action would have been timely commenced at the time of commencement of the prior action and that service upon defendant is effected within such six-month period.

N.Y. C.P.L.R. § 205.  This qualified six-month rule excludes dismissals for failure to prosecute, among other types of terminations.  Defendants' theory would arguably circumvent this exclusion while creating an extended limitations period beyond even that which is afforded under § 205.

[12]  Defendants rely on *Phalen-Sobolevsky* v. *Mullin*, 811 N.Y.S.2d 506, 506 (4th Dep't 2006), but that case is distinguishable.  There, the court tolled the foreclosure-limitations period because the defendant had elected to bring an action in law to recover the debt in a different court.  *Id.*  Moreover, *Mullin* provides little supporting analysis for its holding, only one case has cited it to date, and that citation was not for the tolling proposition.  *See LePore* v. *Shaheen*, 821 N.Y.S.2d 532, 533 (4th Dep't 2006).  Indeed, *LePore* cited *Mullin* in support of its holding that the *LePore* plaintiff was entitled

ii.    **The Parties' Mandatory Settlement Conferences and HAMP-Application Process Did Not Toll the Statute of Limitations**

Defendants argue alternatively that their limitations period was "stayed while the 2008 Foreclosure proceeded through mandatory settlement conferences conducted pursuant to CPLR § 3408." (Def. Br. 21).  Section 3408 provides in relevant part that "the court shall hold a mandatory conference within sixty days after the date when proof of service is filed with the county clerk, or such adjourned date as has been agreed to by the parties" in any residential foreclosure action involving a home loan.  *See* N.Y. C.P.L.R. § 3408(a); *see also CIT Bank, N.A.* v. *O'Sullivan*, No. 14 Civ. 5966 (ADS), 2016 WL 2732185, at *10 (E.D.N.Y. May 10, 2016) (discussing same).  As part of the 2008 Foreclosure Action, the parties participated in seven settlement conferences over the span of 14 months.  (*See* Haber Decl., Ex. C).  Defendants argue that this period of "time spent in the settlement conferences *amounts* to a statutory prohibition on foreclosing" and, therefore, the statute of limitations should be tolled for that same period under § 204.  (Def. Br. 22 (emphasis added)).

Defendants also make the related argument that their limitations period should be tolled "at a minimum during the timeframe encompassing [Vito's] various submissions of the HAMP Applications and the resulting lender review by IndyMac Mortgage." (Def. Br. 23).  Their proffered CPLR § 204 hook for this

_____

to summary judgment on his RPAPL Article 15 action to cancel and discharge his mortgage on the grounds that any foreclosure action was time-barred.  *Id.*

is the set of loss-mitigation procedures specified in Regulation X of the Real

Estate Settlement Procedures Act ("RESPA"), 12 C.F.R. §§ 1024.1-1024.41,

which Defendants argue precluded IndyMac from "advanc[ing] a foreclosure

action during the pendency of [Vito's] loss mitigation application."  (Def. Br. 24

(citing 12 C.F.R. § 1024.41(b)(2), (g))).  The HAMP Guidebook, too, appears to

provide a similar foreclosure-suspension period.  (*See* Haber Decl., Ex. D).

Here, Vito submitted five HAMP applications between October 2012 and June

2013 (*see* Pl. 56.1 ¶¶ 68-79; Steiner Decl., Ex. Z (Oct. 2012); *id.*, Ex. AB (Feb.

2013); *id.*, Ex. AP (Apr. 2013); *id.*, Ex. AE (May 2013); *id.*, Ex. AG (June 2013));

and IndyMac corresponded with him through July 2013 (*id.*, Ex. AJ).

Defendants argue that "[d]uring this timeframe, [IndyMac] was *effectively*

prohibited from advancing the 2008 Foreclosure."  (Def. Br. 23 (emphasis

added)).

Both of these sets of arguments boil down to the same point:  Defendants

assert that they were inhibited from filing or advancing their foreclosure action

and, therefore, § 204 tolls their limitations period to bring another foreclosure

action on the same Loan.  Both arguments are unpersuasive.

For starters, New York state and federal judicial decisions involving

§ 3408 mandatory settlement conferences or Regulation X foreclosure

requirements abound.  *See, e.g., Wells Fargo Bank, N.A.* v. *Meyers*, 966

N.Y.S.2d 108, 114-15 (2d Dep't 2013) (§ 3408); *He* v. *Ocwen Loan Servicing,*

*LLC*, No. 15 Civ. 4575 (JS), 2016 WL 3892405, at *2 (E.D.N.Y. July 14, 2016)

(Regulation X).  Yet Defendants identify not a single instance where a court has

found § 3408 or Regulation X to qualify as a "statutory prohibition" under § 204(a) such that those prohibitions tolled § 213's six-year statute of limitation to bring a foreclosure action.  The Court has identified none either, and this vacuum gives the Court pause.[13]

Foreclosure dismissals for failure to prosecute are not uncommon or unforeseen, and § 3408 settlement conferences, given their generally mandatory nature in this type of foreclosure actions, are likewise commonplace.  The Court suspects that if New York authorities understood the foreclosure-settlement process to toll the period to bring a subsequent foreclosure action on the same loan, they would have articulated that understanding at some point, through some medium, be it judicial or legislative.  The Court cannot find based on the authorities presented that the time spent in § 3408 settlement conferences — which are part and parcel of the foreclosure process — "amount[s] to a statutory prohibition on foreclosing" under § 204.  (Def. Br. 22).  *Cf. Young* v. *N.Y.C. Transit Auth.*, 903 F.2d 146, 163-64 (2d Cir. 1990) ("[I]t is fundamental that needless decisions of state law should be avoided both as a matter of comity and to promote justice between

---

[13]    Indeed, what relevant authority the Court has identified seems to imply just the opposite.  *Cf. Citimortgage, Inc.* v. *Gueye*, 38 N.Y.S.3d 830 (Table), 2016 WL 3450850, at *2-3 (Sup. Ct. N.Y. Cty. 2016) (recognizing that "an inordinate delay attributable to a foreclosing plaintiff may result in the loss of interest or penalties due under the terms of the borrower's loan" and, therefore, that "New York courts have tolled" the *borrower's* loan interest where "[lenders] have failed to negotiate in good faith with borrowers at settlement conferences pursuant to CPLR [§] 3408"); *Bank of N.Y.* v. *Shurko*, 31 N.Y.S.3d 920 (Table), 2015 WL 9694253, at *17 (Sup. Ct. Kings Cty. 2015) (rejecting lender's argument that "delays associated with mandatory foreclosure settlement conferencing" excused its untimely motion for a judgment of foreclosure, and granting borrower's motion to dismiss the foreclosure complaint).

the parties, by procuring for them a surer-footed reading of applicable law."
(internal quotation marks and citations omitted)).

Moreover, it is undisputed that Vito's HAMP applications were submitted
"between October 2012 and June 2013, and IndyMac corresponded with him
through about July 18, 2013." (Def. Br. 23).  What both parties overlook,
however, is that the Regulation X loss-mitigation procedures on which
Defendants rely did not go into effect until January 10, 2014.  *See Sutton* v.
*Citimortgage, Inc.*, No. 16 Civ. 1778 (KPF), 2017 WL 122989, at *4 (S.D.N.Y.
Jan. 12, 2017).  And no argument is made that the requirements apply
retroactively for purposes of tolling or otherwise.  *Cf. Campbell* v. *Nationstar
Mortg.*, 611 F. App'x 288, 298 (6th Cir.) (non-precedential decision) (affirming
holding that 12 C.F.R. § 1024.41 does not apply retroactively), *cert. denied*, 136
S. Ct. 272 (2015).  Thus, even if Regulation X's loss-mitigation procedures
could qualify as a statutory prohibition under § 204(a) — which the Court does
not hold, as discussed above — such a prohibition would not have been in
effect during the parties' HAMP negotiations.

The Court is reminded of CPLR § 201's general warning that "[n]o court
shall extend the time limited by law for the commencement of an action."  N.Y.
C.P.L.R. § 201.  Against this backdrop, and based on the authorities presented
by the parties, the Court declines to find that § 3408 mandatory-settlement or

33

Regulation X loss-mitigation procedures qualify as a "statutory prohibition" that tolled Defendants' foreclosure action under § 204(a).[14]

### c.   The Statute of Limitations Was Not Renewed

Defendants also pursue a related argument that the statute of limitations period was revived by virtue of Vito's multiple HAMP application materials reaffirming his debt.  The Court disagrees.

### i.   Applicable Law

Defendants' argument relies upon New York General Obligations Law § 17-101, which provides:

> An acknowledgment or promise contained in a writing signed by the party to be charged thereby is the only competent evidence of a new or continuing contract whereby to take an action out of the operation of the provisions of limitations of time for commencing actions under the civil practice law and rules other than an action for the recovery of real property.  This section does not alter the effect of a payment of principal or interest.

N.Y. Gen. Oblig. L. § 17-101.  Under this provision, "[a]n acknowledgment or promise to perform a previously defaulted contract must be in writing to re-start the statute of limitations."  *Guilbert* v. *Gardner*, 480 F.3d 140, 149-50 (2d Cir. 2007).  Additionally, the writing must "[i] recognize an existing debt and [ii] contain nothing inconsistent with an intention on the part of the debtor to pay it."  *Clarex Ltd.* v. *Natixis Sec. Americas LLC*, 988 F. Supp. 2d 381, 390

---

[14]   The Court need not reach whether the 90-day pre-foreclosure notice, issued February 26, 2014, pursuant to RPAPL § 1304, "act[ed] as a toll of the [statute of limitations] pursuant to CPLR § 204."  (Def. Br. 22).

(S.D.N.Y. 2013) (internal quotation marks omitted) (quoting *Knoll* v. *Datek Sec. Corp.*, 769 N.Y.S.2d 581, 582 (2d Dep't 2003)).

Moreover, "[i]f a written promise or acknowledgement is not unconditional but instead is contingent upon some future event, the creditor has the burden of proving that the condition has been met."  *Faulkner* v. *Arista Records LLC*, 797 F. Supp. 2d 299, 312 (S.D.N.Y. 2011) (citing *Flynn* v. *Flynn*, 572 N.Y.S.2d 307, 309 (1st Dep't 1991)).  In *Callahan* v. *Credit Suisse (USA), Inc.*, for example, the court recognized that "[u]nder § 17-101, the statute of limitations could be tolled or restarted if [the defendants] unconditionally acknowledged an intent to pay amounts due," but held that the defendants' proposed separation agreement there did not "unconditionally acknowledge" such intent because it was "clearly conditioned on [the plaintiff's] acceptance." No. 10 Civ. 4599 (BSJ), 2011 WL 4001001, at *7 (S.D.N.Y. Aug. 18, 2011); *see also Sitkiewicz* v. *Cty. of Sullivan*, 681 N.Y.S.2d 677, 678-79 (3d Dep't 1998) (holding that an "offer letter was not an unconditional promise to pay a sum certain" in satisfaction of § 17-101 because it did not acknowledge the debt but "merely made an offer of settlement which [the] plaintiff never accepted").

### ii.    Analysis

#### a)    *The Home Affordable Modification Program (HAMP)*

Before turning to whether Vito's HAMP applications revived the limitations period, the Court briefly reviews the context in which those applications were made.  HAMP is a federal program that was established pursuant to the Emergency Economic Stabilization Act of 2008, 12 U.S.C.

§ 5219a.  *See Griffith-Fenton* v. *Chase Home Fin.*, No. 11 Civ. 4877 (VB), 2012 WL 2866269, at *3 (S.D.N.Y. May 29, 2012).  The program was designed "to help financially struggling homeowners by reducing their monthly loan payments to an affordable level, and provides financial incentives to loan servicers and investors to encourage them to modify the terms of existing private mortgages in order to avoid foreclosure."  *Id.* (citing *Thomas* v. *JPMorgan Chase & Co.*, 811 F. Supp. 2d 781, 786-87 (S.D.N.Y. 2011)).  "Participation in the program is voluntary, and the servicer ultimately determines whether a borrower is eligible for a loan modification."  *Id.*

The first step toward obtaining a loan modification under HAMP is an application for a Trial Period Plan.  (*See* Steiner Decl., Ex. AA, at 7).  If the application shows the borrower to be eligible, the servicer offers the borrower a chance to participate in the Trial Period Plan, under which the borrower pays a lower mortgage payment for a three-month trial period.  (*Id.*).  "If [the borrower] successfully complete[s] all of the required trial payments on time, and [their] income and expenses are determined to indeed be accurate, [they] receive a permanent offer for a loan modification."  (*Id.*).  *See generally Rivera* v. *Bank of Am. Home Loans*, No. 09 Civ. 2450 (LB), 2011 WL 1533474, at *1 n.4 (E.D.N.Y. Apr. 21, 2011) (discussing HAMP procedures).

### b)      *Vito's HAMP Applications*

Vito submitted HAMP applications in October 2012, February 2013, April 2013, May 2013, and June 2013, each of which acknowledged his "need for mortgage relief."  (*See* Steiner Decl., Ex. Z (Oct. 2012); *id.*, Ex. AB (Feb. 2013);

36

*id.*, Ex. AP (Apr. 2013); *id.*, Ex. AE (May 2013); *id.*, Ex. AG (June 2013)).  Most

applications had a "Hardship Affidavit" section that read: "I (We) am/are

requesting review under the Making Home Affordable program.  I am having

difficulty making my monthly payment because of financial difficulties," and

then permitted the affiant to check applicable boxes; Vito cited the reduction of

household income as his source of hardship.  (*See, e.g., id.*, Ex. Z (Oct. 2012);

*id.*, Ex. AE (May 2013); *id.*, Ex. AG (June 2013)).[15]

Along with his February 2013 and April 2013 applications, Vito also

submitted identical Hardship Letters, one handwritten and one typed, in which

he stated:

> I am writing to ask [IndyMac] for a loan modification for
> the mortgage on the property at 60 Interlaken Avenue
> New Rochelle, NY 10805.  Within the last few years I
> have had some major setbacks in my life.  During 2006,
> my wife Marion and I separated and I moved out of the
> family home.  At the time, my wife was a stay at home
> mom and I was trying to continue to pay the house bills
> and sustain a new life arrangement.  Shortly after this,
> I lost my job and was unemployed for almost 2 years.
> Currently, I am a full time employee as is my ex wife.
> We feel if given a chance and a modification, we will be
> able to resume ownership of our home and pay our bills
> on time.

(Steiner Decl., Ex. AK; Pl. 56.1 ¶ 80).

In response to each of these HAMP applications, IndyMac sent status

notices informing Vito that his application was incomplete and identifying what

---

[15]    The April 2013 application's Hardship Affidavit takes a slightly different format.  There,
Vito's cited reasons for hardship were unemployment, divorce, and "other."  (*See* Steiner
Decl., Ex. AP (Apr. 2013)).

documents or information were still missing.  (*See* Steiner Decl., Ex. AA, AC,

AD, AF, AH).  Those notices also included a form disclaimer that warned:

> **Not All Borrowers Will Qualify for a Loan Modification Offer.** Your completed application, including income documentation, will be used to evaluate whether you are eligible for a modification or other workout; however, IndyMac Mortgage Services is not obligated to offer you assistance based solely on the representations and information included in your submission. We reserve the right to verify the information you submitted and request other information and/or documentation to fully evaluate your eligibility.  IndyMac Mortgage Services follows the HAMP guidelines to determine eligibility for a loan modification to the extent permitted under our contractual agreements with the investors who own the loans we service.  *Not all borrowers who submit an application will qualify for a loan modification.  This is not a firm offer for a modification and does not override any foreclosure proceedings that may be in process from moving forward* as permitted under the applicable servicing agreements.

(*Id.* (first emphasis in original; second emphasis added)).  The June 2013 form

disclaimer also adds that "[a] borrower will be deemed to have requested

consideration for a loan modification or alternative program when a complete

application is received by IndyMac Mortgage Services."  (Steiner Decl., Ex. AH).

### c)    *Vito's HAMP Applications Did Not Renew the Statute-of-Limitations Period*

Defendants contend that "[e]ach HAMP Application submitted by [Vito]

constituted an 'acknowledgement' of his existing mortgage debt and contained

nothing 'inconsistent' with his intention to repay."  (Def. Br. 26).  They also

argue that Vito's Hardship Letters "further evidenc[e] his acknowledgment of

the mortgage debt with an intention to repay," particularly when viewed in the

context of his deposition testimony that it was his "intent to pay" once the Loan was modified.  (*See id.* at 27 (citing Steiner Decl., Ex. B (Costa Dep.), at 46:15-18)).

The Court disagrees.  Vito's HAMP applications, including the Hardship Letters, did not revive Defendants' statute-of-limitations period to foreclose on the Mortgage.  None of these writings unconditionally acknowledged Vito's intent to pay the Loan; most liberally construed, they implied a conditional offer of settlement that IndyMac never accepted.  The weight of New York authorities — most of which are uncited by the parties — supports this conclusion.

Even prior to the advent of HAMP, courts rejected such conditional offers to settle mortgage debts as a basis to revive a foreclosure-limitations period under § 17-101.  For example, in *Petito* v. *Piffath*, the New York Court of Appeals held that a foreclosure-lawsuit settlement agreement, which did not extinguish the underlying debt, did not constitute "an acknowledgement of the debt sufficient to renew … the Statute of Limitations [under § 17-101] for enforcement of the debt itself."  85 N.Y.2d 1, 8 (1994).  This was because the settlement agreement "contain[ed] neither an express acknowledgment of [the borrower's] indebtedness nor an express promise to pay the mortgage debt per se.  Rather, the agreement contained only a promise to pay [the plaintiff] a specific sum in exchange for [the plaintiff's] agreement to forego prosecution of its foreclosure action[.]"  *Id.*

The Third Department reached a similar outcome in *Sichol* v. *Crocker*, 576 N.Y.S.2d 457 (3d Dep't 1991).  There, a borrower and lender discussed a proposed modification to a note and mortgage after the borrower had defaulted. *Id.* at 458.  After these talks, the borrower sent the lender a correspondence acknowledging that he "owes [the lender] money for the first mortgage payment," that he "[had not yet] received the Modification Agreement from [the lender]," and that he requests its prompt forwarding.  *Id.*  The contemplated agreement was never executed, so the lender sued to foreclose on the mortgage. *Id.* at 457-58.  The Third Department upheld the dismissal of the lender's foreclosure action as time-barred, and rejected the lender's argument that the letter had revived the statute-of-limitations period under § 17-101.  *Id.* at 458. The court held that "while the letter arguably acknowledged the existence of indebtedness, there was no unconditional promise to pay it.  Rather, a condition precedent, i.e., preparation and execution of a modification agreement, was imposed, thereby rendering any promise conditional, and the condition was never fulfilled."  *Id.*

More recently, the Second Department held in *Hakim* v. *Peckel Family Limited Partnership* that the defendants' settlement offer letters did not renew the foreclosure-limitations period under § 17-101 because the settlement was "conditioned on the plaintiff's acceptance of a disputed reduction in the principal amount of the mortgage — a condition which was never accepted by the plaintiff."  721 N.Y.S.2d 543, 544 (2d Dep't 2001).  Therefore, the court

40

concluded, "[t]he letters did not constitute an unconditional and unqualified acknowledgment of a debt."  *Id.*

So too here.  Vito's HAMP applications and supportive materials, at best, expressed a conditional promise to pay the mortgage Loan if the modification sought was provided.  *See Flynn*, 572 N.Y.S.2d at 309 ("[P]laintiff's promise is completely contingent upon his receipt of 'some assistance' and therefore not an unconditional promise."); *see also Reiss* v. *Deutsche Bank Nat. Trust Co.*, 37 N.Y.S.3d 653, 656 (Sup. Ct. Westchester Cty. 2016) (denying the defendant's motion to dismiss a quiet-title action and commenting that plaintiffs' "'Hardship Affidavit' … is nothing more than 'a conditional promise to pay' if and when plaintiffs are approved for a loan modification and they agree to such terms").

IndyMac never granted Vito a permanent loan modification, nor did it even extend Vito an offer to join the Trial Period Plan.  (*See* Steiner Decl., Ex. AA at 3 (IndyMac's application status-notice disclaiming that "[t]his is not a firm offer for a modification and does not override any foreclosure proceedings that may be in process from moving forward"); *see also Reiss*, 37 N.Y.S.3d at 656-57 (recognizing that "[i]t makes no difference that the Hardship Affidavit contains plaintiffs' assertion, 'We feel with the HAMP Program, once again we pay for a new mortgage,'" because that assertion was "simply part of their prayer for relief and does not otherwise establish anything other than a conditional promise to pay a modified loan if and when approved for a modification upon terms acceptable by plaintiffs").  Indeed, IndyMac never even

accepted Vito's HAMP applications as complete.  (*See, e.g.,* Def. 56.1 Opp. ¶¶ 70, 72, 74 (acknowledging that IndyMac sent correspondence reflecting that Vito's HAMP applications "required additional documents/information to be completed")).

Just a few months ago in *United States Bank National Association* v. *Martinez*, the Kings County Supreme Court addressed whether a borrower's payments *during* the HAMP Trial Period renewed the statute of limitations under § 17-101.  *See* 2016 WL 7973961, at *16-17 (Table) (Sup. Ct. Kings Cty. 2016).  Relying on *Petito* and *Sichol*, among other New York precedents, the court held that "[the borrower's] execution of the 2009 HAMP Trial was not an acknowledgment of the debt sufficient to toll and renew the Statute of Limitations [under] § 17-101."  *Id.* at *17.  The court reasoned:

> The 2009 HAMP Trial does not qualify as an acknowledgment of an existing debt, pursuant to GOL § 17-101, because the 2009 HAMP Trial does not contain [the borrower's] express acknowledgment of his indebtedness under the … Mortgage and Note [n]or [the borrower'] express promise to pay any of the outstanding debt.  Instead, [the borrower] made a conditional promise to make three payments … during the three-month 2009 HAMP Trial period during which [the lender] promised to review [the borrower's] documented income to determine whether [he] qualified for a final HAMP modification.

*Id.*; *see id.* at *16 ("[A] HAMP modification trial is not an agreement for the binding obligations of the parties going forward because it is merely a trial arrangement."  (internal quotation marks omitted) (quoting *Meyers*, 966 N.Y.S.2d at 116)).

Here, the Court need not — and does not — issue so broad a holding. That is because, again, IndyMac never even accepted Vito's application as complete, much less offer him enrollment in the Trial Period Plan or accept his trial-period payments. The Court concludes that no reasonable jury could find that Vito's HAMP applications and hardship letters constituted an "unconditional and unqualified" acknowledgment of, and promise to pay, his debt. *Hakim*, 721 N.Y.S.2d at 544. "Rather, a condition precedent," modification of his Loan, "was imposed, thereby rendering any promise conditional, and the condition was never fulfilled." *Sichol*, 576 N.Y.S.2d at 458. Consequently, Vito's HAMP submissions did not restart the statute of limitations on Defendants' foreclosure claim under § 17-101.

### d.     Cancellation and Discharge of the Loan Are Granted and Foreclosure Is Denied

Plaintiffs have established that there is no genuine dispute of material fact that more than six years have passed since the accrual of Defendants' instant foreclosure action. And Defendants have identified no valid basis for tolling or renewing the statute of limitations for foreclosure. The Court thus finds that the instant foreclosure counterclaim by Defendants, as well as any future such actions, are time-barred as a matter of law under CPLR § 213. *See* N.Y. C.P.L.R. § 213 ("[A]n action upon a bond or note, the payment of which is secured by a mortgage upon real property, or upon a bond or note and mortgage so secured, or upon a mortgage of real property, or any interest therein" shall "be commenced within six years.").

Accordingly, Plaintiffs are granted summary judgment (i) in favor of their RPAPL Article 15 claim seeking the cancellation and discharge of record of the Mortgage, a declaration adjudging the Property to be free from an encumbrance arising from the Mortgage, and a declaration discharging Plaintiffs' obligations under the Note, *see* N.Y. R.P.A.P.L. § 1501(4), and (ii) against Defendants' foreclosure counterclaim and affirmative defenses.[16]  By the same token, Defendants are denied summary judgment in favor of their foreclosure counterclaim and against Plaintiffs' RPAPL Article 15 claim.

## 2. Defendants Are Denied Summary Judgment on Their Unjust-Enrichment Counterclaim

Defendants argue in the alternative that even if their foreclosure claim is doomed, they are still entitled to the Carrying Costs they incurred under a theory of unjust enrichment.  (Def. Br. 37-39).

### a. Applicable Law

To prevail on a claim for unjust enrichment in New York, a party must establish "[i] that the defendant benefitted; [ii] at the plaintiff's expense; and [iii] that equity and good conscience require restitution." *Beth Israel Med. Ctr.* v. *Horizon Blue Cross & Blue Shield of N.J., Inc.*, 448 F.3d 573, 586 (2d Cir.

---

[16]   In their Answer, Defendants assert ten affirmative defenses: (i) timeliness based on renewal of the statute-of-limitations period; (ii) timeliness based on tolling of the statute-of-limitations period; (iii) failure to state a claim; (iv) unclean hands; (v) documentary evidence; (vi) equitable and judicial estoppel; (vii) waiver and ratification; (viii) unjust enrichment; (ix) equitable mortgage; and (x) a catch-all. (*See* Ans. 8-9).  Defendants have either abandoned these defenses, on account of nowhere substantively arguing them in their briefing nor raising an underlying genuine dispute of material fact, or the defenses are subsumed within the statute-of-limitations and unjust-enrichment discussions in this Opinion.  Accordingly, Plaintiffs' motion for summary judgment against Defendants' affirmative defenses is granted.

2006) (internal quotation marks omitted) (quoting *Kaye* v. *Grossman*, 202 F.3d 611, 616 (2d Cir. 2000)).  While the "essence" of such a claim "is that one party has received money or a benefit at the expense of another," *City of Syracuse* v. *R.A.C. Holding, Inc.*, 685 N.Y.S.2d 381, 382 (4th Dep't 1999), "[s]imply claiming that the defendant received a benefit is insufficient to establish a cause of action for unjust enrichment," *Agerbrink* v. *Model Serv. LLC*, 155 F. Supp. 3d 448, 458 (S.D.N.Y. 2016) (citing *Old Republic Nat'l Title Ins. Co.* v. *Cardinal Abstract Corp.*, 790 N.Y.S.2d 143, 145 (2d Dep't 2005)); *see also Carruthers* v. *Flaum*, 388 F. Supp. 2d 360, 371 (S.D.N.Y. 2005) (same).

### b.    Analysis

Defendants argue that they are entitled to summary judgment on their unjust-enrichment counterclaim "because there is no genuine dispute that [DB] has borne ultimate responsibility for the payment of the Carrying Costs dating back to [Vito's] default on December 1, 2007," and "[t]here is also no disputing the clear benefit received by the Plaintiffs through [DB's] payment of the Carrying Costs."  (Def. Br. 38-39).

Fair enough.  Defendants appear to have paid nearly $150,000 in Carrying Costs, much of which would otherwise have been Plaintiffs' responsibility.[17]  And Plaintiffs' efforts to obtain the Property unencumbered *and also* walk away from the Carrying Costs certainly provokes a visceral

---

[17]     If Defendants had a valid unjust-enrichment claim, there would arise the ancillary question of what portion of these Carrying Costs remain recoverable under the governing statute of limitations.  The Court need not reach this issue, however, in light of the unjust-enrichment disposition articulated above.

reaction.  But a more nuanced look at unjust-enrichment doctrine reveals a fatal flaw in Defendants' claim.

Looking beyond the superficially capacious elements of an unjust-enrichment claim, it is well-settled that "the mere fact that the plaintiff's activities bestowed a benefit on the defendant is insufficient to establish a cause of action for unjust enrichment"; rather, "it is [also] the plaintiff's burden to demonstrate that services were performed *for the defendant* resulting in the latter's unjust enrichment."  *Law Offices of K.C. Okoli, P.C.* v. *BNB Bank, N.A.*, 481 F. App'x 622, 627 (2d Cir. 2012) (summary order) (internal quotation marks omitted) (quoting *Clark* v. *Daby*, 751 N.Y.S.2d 622, 623 (3d Dep't 2002) (emphasis in *Clark*)).[18]  Simply put, Defendants have failed to demonstrate that their ongoing payments of Carrying Costs "were performed *for*" Plaintiffs, and "the mere fact" that Defendants' payments "bestowed a benefit on [Plaintiffs] is insufficient."  *Clark*, 751 N.Y.S.2d at 623.

DB (indirectly through its various mortgage servicers) began paying the Carrying Costs when Vito defaulted in December 2007, but there is no evidence that these payments were made *for Plaintiffs* as opposed to *for Defendants'* own interest in maintaining the Property in the event that foreclosure would become necessary, as it soon did.  Defendants' singular focus on Plaintiffs' windfall is thus incomplete.  That this enrichment has been ongoing for nearly a decade is

---

[18]    In the cases discussed in this section, "plaintiff" refers to the party who conferred a benefit and seeks recovery under an unjust-enrichment theory, while "defendant" is the party who received the benefit.

also in large measure a result of Defendants' inaction; diligence in the 2008 Foreclosure Action, for example, would likely have brought clarity sooner.

Moreover, Defendants rely principally on a single precedent that offers little help.  They look to *Mebane*, a 1994 decision in which the Second Department spent the bulk of its opinion working toward the conclusion that a foreclosure action was time-barred because more than six years had passed since acceleration of the mortgage loan.  *See Mebane*, 618 N.Y.S.2d at 89.  So far, so good.  Then, in a single sentence to conclude the opinion, the court found that the lender had "stated a valid cause of action sounding in unjust enrichment to recover sums advanced, *inter alia*, for property taxes and insurance, within the six-year period prior to the commencement of this action."  *Id.* at 90 (citations omitted).  Unfortunately, little can be gleaned from so terse a holding.[19]

By contrast, Plaintiffs' best authority is a 2002 Third Department decision that isolates the unjust-enrichment inquiry presented here, and analyzes it based on the principles earlier articulated.  *Clark* v. *Daby* arose from an earlier decision that had dismissed the lenders' foreclosure action and deemed a bond and mortgage null and void.  *See* 751 N.Y.S.2d at 623.  While the lenders pursued an appeal, they elected to pay off the property's overdue taxes in order to prevent the county's impending tax sale of the property.  *Id.*

---

[19]   What is more, as of the date of this Opinion, not a single decision cites *Mebane* for this proposition.  Indeed, neither Defendants' briefs, nor the Court's efforts, reveal another supporting precedent on all fours with Defendants' uniquely situated unjust-enrichment argument.

Those appellate efforts eventually failed, and the lenders brought an unjust-enrichment action against the borrower in order to recover the taxes they had paid, taxes that would otherwise have been the obligation of the borrower.  *Id.*

The Third Department — relying on the principle that "the mere fact that the plaintiff's activities bestowed a benefit on the defendant is insufficient" and that, instead, the plaintiff's "services [must be] performed *for the defendant* resulting in [the latter's] unjust enrichment" — upheld the summary-judgment dismissal of the lenders' unjust-enrichment claim.  *Clark*, 751 N.Y.S.2d at 623 (emphasis in original) (internal citations omitted).  The court recognized that there was "no question" that the lenders' tax payment "worked to [the borrower's] benefit by relieving him of that burden."  *Id.* at 624.  Nevertheless, the court found that it was

> equally clear that plaintiffs operated under no mistake of fact or law but, rather, their sole motivation in making the payment was to protect their own interests.
>
> * * *
>
> The fact that plaintiffs' calculated risk failed makes their conduct no less voluntary, and there is no evidence or claim that defendant's conduct with regard to this matter was in any way tortious or fraudulent. … [A]ny benefit to defendant was purely incidental, thereby defeating plaintiffs' claim of unjust enrichment.

*Id.*

The Court finds that the unique facts of this case are governed by the Third Department's reasoning and holding in *Clark*:  Defendants took a calculated risk in continuing to pay the Carrying Costs in order to maintain the Property following Plaintiffs' December 2007 default.  Defendants point to no

48

evidence that this was done *for* Plaintiffs' benefit.  Indeed, if the 2008 Foreclosure Action or the instant one had been successful, Defendants would have enjoyed the fruits of their investment.  That the Carrying Costs investment turns out, in hindsight, to have been a losing gamble determines who ultimately (and incidentally) benefits, but it does not retroactively alter for whom that benefit was intended.  Accordingly, Defendants' motion for summary judgment in favor of their unjust enrichment counterclaim is denied and Plaintiffs' motion for summary judgment against the counterclaim is granted.

## CONCLUSION

For the foregoing reasons, Plaintiffs' motion for summary judgment is GRANTED in its entirety and Defendants' motion for summary judgment is DENIED in its entirety.  The Clerk of Court is directed to terminate the motions at Docket Entries 36 and 42, adjourn all remaining dates, and close this case.

SO ORDERED.

Dated:      March 30, 2017
            New York, New York

_____
            KATHERINE POLK FAILLA
            United States District Judge